**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Equal Employment Opportunity Commission,<br><br>  Plaintiff,<br><br>vs.<br><br>Alamo Rent-A-Car LLC;<br>ANC Rental Corporation,<br><br>  Defendants. | No. CIV 02-01908-PHX-ROS<br><br>**ORDER** |

On March 28, 2005, this Court issued a Short Order granting Plaintiff Equal Employment Opportunity Commission's ("EEOC") Motion for Partial Summary Judgment (Doc. #49), with an opinion to follow. This is that opinion.[1]

**I.   JURISDICTION**

This Court has subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights action), and § 1345 (United States as a plaintiff).

**II.   BACKGROUND**

---

[1] The Court did not schedule oral argument on Plaintiff's Motion because the parties submitted memoranda thoroughly discussing the law and evidence in support of their positions, and oral argument would not have aided the Court's decision. See Mahon v. Credit Bur. of Placer County, Inc., 171 F.3d 1197, 1200 (9th Cir. 1999), modified, No. 97-017298, 1999 U.S. App. LEXIS 8016; Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998).

**A.     Factual Background**

Bilan Nur is a Muslim woman who immigrated to the United States from Somalia in 1998. [Doc. #50 (Plaintiff's Statement of Undisputed Facts ("PSOF")) ¶¶ 1, 6]. Alamo hired Ms. Nur as a rental agent in November 1999 for a rental agency location on East Washington Street in Phoenix, Arizona. [Id. ¶ 2]. In this position, Ms. Nur rented cars to customers, accepted payment, and answered the telephone; her duties required interaction with clients. [Id. ¶ 4]. Until the events which led to her termination, Ms. Nur's job performance was "fine." [Id. ¶ 5]. While Ms. Nur was employed by Alamo, the company had in effect a "Dress Smart Policy" which promoted a favorable first impression with customers, and expressly prohibited employees from wearing certain clothing and accessories, for example, the wearing of more than one earring, open toe shoes, and half-grown beards. [Id. ¶¶ 9, 13]. Plaintiff states that the Policy did not expressly prohibit the wearing of head coverings; Alamo counters that the Policy prohibits the wearing of any "garment or item of outer clothing not specifically mentioned in the policy . . . ." [PSOF ¶ 10; Doc. #56, Defendant's Controverting Statement of Facts ("DCSOF") ¶ 10].

The Muslim holiday of Ramadan began on November 16, 2001. [Id. ¶ 17; DCSOF ¶ 17]. At some point in November 2001, Plaintiff spoke to Alamo's "City Manager" Victor Bellavia and requested permission to wear a head covering at work during the Ramadan holiday.[2] Mr. Bellavia contacted Alamo's Human Resource Manager for the Western Region, Heather Phillips, about Ms. Nur's request for an accommodation to wear a head covering during Ramadan. Ms. Phillips instructed Bellavia that Plaintiff would be allowed to wear a head covering at work in the back of the office, but that she would need to remove

---

[2] Ms. Nur testified she approached Mr. Bellavia two weeks prior to the beginning of Ramadan to request she be allowed to wear a head scarf at work during the holiday. [Doc. #50, Ex. A (Nur Dep.), p. 26, l. 21 to p. 28, l. 7]. Mr. Bellavia testified that Ms. Nur approached him with the request on November 20, 2001, after the Ramadan holiday had begun. [Id., Ex. B (Bellavia Dep.), Ex. 1].

1 the head covering while at the rental counter. [PSOF ¶ 22]. Alamo did not excuse Ms. Nur
2 from working at the rental counter during Ramadan. [Id. ¶ 28].

3       On December 1, 2001, an Alamo manager, Herman Schilling wrote Ms. Nur a
4 "Counselling [sic] Review," which stated: "You had previously been told by the City
5 Manager that you are not allowed to wear a hat or head covering in your position at work.
6 When I arrived at work this morning you were wearing a veil over your hair and I told you
7 to clock-out and discuss with the City Manager on Sunday." [POOF, Ex. B (Believe Dep.),
8 Ex. 2]. The next day, December 2, 2001, Ms. Nur received another Counseling Review,
9 pursuant to which she was suspended and advised: " You had been previously informed by
10 the city manager that you are not allowed to wear a hat or head covering in your position at
11 work. You were wearing a veil over your hair this morning. You were sent home yesterday
12 for the same violation and will be sent home again today. You need to discuss this issue with
13 the city manager tomorrow." [Id., Ex. 3]. The next day (December 3, 2001), Ms. Nur again
14 received a counseling review. In this review, Mr. Bellavia and LaShunda Brown advised Ms.
15 Nur: "Bilan you have been verbally warned on several different occassion [sic] reguarding
16 [sic] your work uniform. You were also sent home on 12/01 - 12/02 for failing to comply
17 with company policy. You are been [sic] suspended pending investigation. You are to return
18 on 12/6/01, 8:30 am, To meet with the City Manager." [Id., Ex. 4].

19       Also on December 3, 2001, Mr. Bellavia wrote a memorandum to the file
20 summarizing the disciplinary actions taken against Ms. Nur:

> Bilan Nur approached me on Tuesday November 20, 2001 asking me if she was allowed to wear a scarf/head covering during her religious holiday Rhamadan. I informed her that I would run it by Human Resources and let her know if she was allowed to do this. Last year in December of 2000 Sal Vargas [Assistant City Manager] informed her she could not do this and made her take it off. Heather Phillips from Human Resources informed me that she was not allowed to have her head covered do [sic] to the fact its [sic] not part of the uniform policy. I informed this to Bilan and she was not happy with the answer. When the Holiday started she insisted on having her head covered. I informed Heather of the situation and she informed me to warn her that she could not wear it and if she continue [sic] to come to working [sic] wearing it Alamo would then start counseling her immediately. On Saturday December 1, 2001 she came to work not meeting the companies [sic] uniform policy, we counseled her on it and sent her home. On Sunday December 2, 2001 Bilan did not follow the company policy on her uniform and we counseled her again

- 3 -

> and sent her home. On Monday December 3, 2001 Bilan did not follow company policy with regards to Alamo uniform policy, we counseled her and suspended her three-day [sic] which may result in her termination of employment with Alamo Rent a Car.

[PSOF, Ex. B (Bellavia Dep.), Ex. 1]. Alamo terminated Ms. Nur's employment on December 6, 2001 for violation of company rules. [PSOF, Ex. I (Vargas Dep.), Ex. 5]. The termination form indicates that Ms. Nur was not eligible for re-hire. [Id.].

**B.    Procedural history**

EEOC filed its Complaint on September 27, 2002. [Doc. #1]. On November 19, 2002, the matter was stayed after Alamo filed for Chapter 11 bankruptcy. [Doc. #6]. The automatic stay was lifted by Order filed on April 14, 2003. [Doc. #11]. EEOC filed the Motion for Partial Summary Judgment (Doc. #49) on April 30, 2004 in which it requests judgment regarding liability on its religious discrimination claim. EEOC asserts the claim pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, on behalf of Bilan Nur, a former employee of Defendants ("Alamo"). Alamo filed its Response on June 18, 2004 (Doc. #55), followed by EEOC's Reply, filed on July 20, 2004 (Doc. #59).

**III.    LEGAL STANDARD ON SUMMARY JUDGMENT**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Jesinger, 24 F.3d at 1130. In addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

- 4 -

1    Furthermore, the party opposing summary judgment "may not rest upon the mere
2    allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing
3    that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co.,
4    Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Brinson v. Linda Rose Joint
5    Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). There is no issue for trial unless there is
6    sufficient evidence favoring the non-moving party; if the evidence is merely colorable or is
7    not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-
8    50. However, because "[c]redibility determinations, the weighing of evidence, and the
9    drawing of inferences from the facts are jury functions, not those of a judge, . . . [t]he
10   evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn
11   in his favor" at the summary judgment stage. Id. at 255 (citing Adickes v. S.H. Kress & Co.,
12   398 U.S. 144, 158-59 (1970)); see Warren v. City of Carlsbad, 58 F.3d 439, 441
13   (9th Cir. 1995).

14   **IV.    DISCUSSION**
15   **A.     Framework**

16   Title VII prohibits as an unlawful employment practice the discharging of an
17   employee because of the employee's religion. 42 U.S.C. § 2000e-2(a)(1). "Religion" is
18   defined to include "all aspects of religious observance and practice, as well as belief, unless
19   an employer demonstrates that he is unable to reasonably accommodate to an employee's .
20   . . religious observance or practice without undue hardship on the conduct of the employer's
21   business." 42 U.S.C. § 2000e(j). The Ninth Circuit employs a two-step framework to
22   analyze claims of religious discrimination under Title VII. Tiano v. Dillard Dep't Stores,
23   Inc., 139 F.3d 679, 681 (9th Cir. 1998). Initially, a plaintiff must establish a prima facie case
24   by demonstrating "(1) she had a bona fide religious belief, the practice of which conflicted
25   with an employment duty; (2) she informed her employer of the belief and conflict; and (3)
26   the employer threatened her or subjected her to discriminatory treatment, including
27   discharge, because of her inability to fulfill the job requirements." Id. (citing Heller v. EBB
28   Auto. Co., 8 F.3d 1433, 1438 (9th Cir. 1993). If the plaintiff establishes her prima facie case,

- 5 -

the burden shifts to the employer to show one of two things: (1) "that it initiated good faith efforts to accommodate reasonably the employee's religious practices"; or (2) "that it could not reasonably accommodate the employee without undue hardship." Id. If negotiations between employee and employer "do not produce a proposal by the employer that would eliminate the religious conflict, the employer must either accept the employee's proposal or demonstrate that it would cause undue hardship were it to do so." Opaku-Boateng v. California, 95 F.3d 1461, 1467 (9th Cir. 1996) (citing EEOC v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 615 (9th Cir. 1988)).

**B.     Plaintiff's prima facie case**

Alamo contends that EEOC has failed to prove a prima facie case of religious discrimination, arguing that Ms. Nur's religious beliefs did not conflict with her job requirements because her "personal practice did not require that she wear a [head covering] at all times during Ramadan." [Doc. #55 (Def.'s Resp.) , p. 4]. Alamo points to evidence that during Ramadan in 2000 (the year prior to the Ramadan at issue), Alamo's management asked Ms. Nur to remove her head covering and she complied, and did not assert a religious need to object to the request. [Id., p. 5]. Alamo concludes that this evidence supports a question of fact regarding "whether Ms. Nur's religious beliefs are what she is stating in this lawsuit." [Id.]. Similarly, Alamo states that because Ramadan in 2001 began on Friday, November 16 and they say Plaintiff did not request an accommodation permitting her to wear a head covering until Tuesday, November 20, 2001, this could suggest that Ms. Nur's religious beliefs did not actually dictate that she wear a head covering at work under all circumstances. Alamo further states that Plaintiff went to the press with her story immediately after her termination and gave conflicting statements at deposition regarding whether she contacted the press or the press contacted her, arguing this casts doubt on whether Ms. Nur's statement of her religious beliefs is credible. [Id., p. 6].

"[I]t is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity – as opposed, of course to the verity – of someone's religious beliefs in . . . the Title VII context." Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir. 1985).

- 6 -

Viewed in the light most favorable to Alamo, however, the evidence does not support the existence of a material factual issue regarding the sincerity of Ms. Nur's religious belief at the time of her termination. During Ramadan 2001, Ms. Nur continued to wear a head covering despite warnings from her supervisors that she would be subjected to progressive disciplinary action, and then was terminated because Alamo concluded she had repeatedly violated its official dress policy. Ms. Nur's actions strongly "demonstrate that [s]he attached the utmost religious significance" to her belief that her religion required her to cover her head during Ramadan. Heller v. EBB Auto Co., 8 F.3d 1433, 1439 (9th Cir. 1993).

Assistant City Manager Sal Vargas testified that he required Plaintiff to remove her head covering during Ramadan in 2000, which he stated she did do without raising any objection, religious or otherwise. Alamo contends that this fact raises a question about whether Ms. Nur's belief was sincere in 2001. An analysis of the sincerity of Ms. Nur's belief should "be measured by the employee's words and conduct at the time the conflict arose between the belief and the employment requirement." EEOC v. IBP, Inc., 824 F. Supp. 147, 151 (C.D. Ill. 1993). In the Complaint, the EEOC alleges that Alamo discriminated against Ms. Nur with regard to her assertion of her religious belief in November and December 2001, not in 2000. [Doc. #1 ¶¶ 7, 15, 18]. Although there is a dispute of fact regarding whether Ms. Nur was permitted to wear a head covering during Ramadan in 1999 and 2000,[3] that dispute is not relevant to the sincerity of Ms. Nur's belief in the Fall of 2001, when Ms. Nur's assertions of religious belief led to her termination. Alamo further contends that because in 2001 Ramadan began on November 16, and because Alamo asserts that Ms. Nur did not raise the head covering issue with Mr. Bellavia until November 20, this is evidence that might lead a fact finder to infer that Ms. Nur did not wear a head covering at work during the first few days of Ramadan 2001, i.e., between November 16 and November 20. [Doc. #55,

---

[3] Plaintiff contends that Alamo allowed her to cover her head during Ramadan in both 1999 and 2000. [PSOF, Ex. F ¶ 6]. Alamo counters that Plaintiff was asked to remove her head covering during Ramadan in 2000, and that she did so without comment. [DCSOF ¶ 6 (Resp.)].

- 7 -

1 p. 5]. Similarly, Alamo suggests that because Ms. Nur was not first disciplined until
2 December 1, 2001, 15 days into the Ramadan holiday, a reasonable fact finder might infer
3 that Plaintiff had acted consistently with the accommodation Alamo offered prior to
4 December 1, thus eroding Plaintiff's claim that Ms. Nur's religious belief was sincere.
5 [DCSOF ¶ 30].

6 These inferences are not reasonable in the factual context before the Court. Plaintiff
7 testified that when Ramadan began, she started to wear a scarf at work. [PSOF, Ex. A (Nur.
8 Dep.), p. 33]. There is nothing in the record demonstrating that Plaintiff did not wear a head
9 covering at work during Ramadan 2001. The record includes deposition testimony of both
10 Victor Bellavia and LaShunda Brown, who supervised Ms. Nur. Neither Bellavia nor Brown
11 testified that Ms. Nur did not wear a head covering during Ramadan in 2001. In fact, Victor
12 Bellavia's December 3, 2001 memorandum to the file states that "[w]hen the Holiday started
13 [Ms. Nur] insisted on having her head covered."  [Doc. #50 (PSOF), Ex. B, Ex. 1].
14 LaShunda Brown testified that Ms. Nur advised her that she wanted to wear a head covering
15 "during Ramadan until after Ramadan was over." [DCSOF, p. 15]. The sort of speculation
16 in which Alamo invites the fact finder to indulge does not create a factual dispute for
17 purposes of summary judgment. Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081-82 (9th Cir.
18 1996). "When the moving party has carried its burden under Rule 56(c), its opponent must
19 do more than simply show that there is some metaphysical doubt as to the material facts."
20 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Alamo has not
21 presented specific material facts in the record to reasonably support the inference that Ms.
22 Nur did not wear a head covering during Ramadan 2001, or the further inference that her
23 asserted religious belief was not sincere.

25 **C.     Alamo's burden**

26 Because Plaintiff has proven a prima facie case of discrimination, the burden shifts
27 to Alamo to show one of two things: (1) that it initiated good faith efforts to reasonably

- 8 -

1 accommodate Ms. Nur's religious practices; or (2) that it could not reasonably accommodate
2 her without undue hardship. Tiano, 139 F.3d at 681.

3      **1.    Reasonable accommodation**

4      Alamo argues that it made a good faith effort to accommodate Ms. Nur, and that Ms.
5 Nur accepted the accommodation. [Doc. #55, p. 7]. Alamo states, without citing authority,
6 that "[w]hen an employer makes a good faith effort to accommodate which an employee
7 accepts, the employer has met its obligation under Title VII." [Id.]. Alamo further argues
8 that "[i]f a jury decides that Ms. Nur agreed that the accommodation was reasonable by
9 agreeing to abide by it, Alamo's duty to accommodate would be fulfilled." [Id., p. 8].

10      Alamo's assertion that it made efforts to reasonably accommodate Plaintiff lack merit.
11 Alamo must demonstrate that it made "some initial step to reasonably accommodate the
12 religious belief" of Ms. Nur (or show that no reasonable accommodation was possible
13 without undue burden). Heller, 8 F.3d at 1440 (internal citation omitted). This obligation
14 requires, at a minimum, that the employer "negotiate with the employee in an effort
15 reasonably to accommodate the employer's religious belief." Id. (internal citation omitted).
16 The accommodation Alamo offered Ms. Nur was that "she would be allowed to wear [a head
17 covering] when she was in the back office . . . but when she went to the rental counter to rent
18 cars in the front of the office, she would have to remove it." [Doc. #50 (PSOF), Ex. B
19 (Bellavia Dep.) p. 25, ll. 10 - 14]. It is undisputed that the accommodation Alamo offered
20 Ms. Nur required her to remove her head covering during Ramadan when she served clients
21 but still required her to serve clients, making it impossible for Ms. Nur to avoid removing her
22 head covering at work. [Doc. #50 (PSOF), Ex. B (Bellavia Dep.), pp. 25 - 28; Ex. C (Phillips
23 Dep.), pp. 45 - 49]. Accordingly, Alamo's proposal would have failed to accommodate Ms.
24 Nur's religious conflict, and was not a reasonable accommodation. Thus, Alamo failed to
25 uphold its burden to attempt to accommodate Ms. Nur's beliefs, and was left with the
26 alternative burden to show that permitting Ms. Nur to wear a head covering during Ramadan
27 while dealing with clients would impose an undue hardship. See Anderson v. General
28

1   Dynamics Convair Aerospace Div., 589 F.2d 397, 401 (9th Cir. 1978) ("The burden was on
2   the [employer], not [the plaintiff] to undertake initial steps toward accommodation.").
3         Alamo seeks to avoid summary judgment by arguing there is a genuine issue of fact
4   whether Ms. Nur accepted Alamo's proposed accommodation.  This argument is based on
5   Mr. Bellavia's testimony, as follows:

6       Q.    And did you inform Bilan of this accommodation?
7       A.    Yes.
8       Q.    What did Bilan say?
9       A.    I believe she agreed to it.
10      Q.    Okay. Why do you believe that?
11      A.    Because then later on she told LaShunda that she wasn't going to remove it
12          when she went to the counter.
13  . . . .
14      Q.    You said you believe Bilan agreed to that. What's the basis for that statement?
15      A.    That we had a conversation, and I gave her the option that was given to me.
16          I got back to her. We had a conversation that she wanted to wear it. I said I
17          would go to HR. HR came back with the reasonable accommodation, and I
18          discussed it with her.
19      Q.    Okay. And you said she agreed to it. I'm asking for the basis.
20      A.    I believe she didn't object and say at that conversation that she would say,
21          "Well, this is not good enough" or "I'm not going to do this." She didn't say
22          that.
23      Q.    Did she ever say, "I agree"?
24      A.    She didn't come out and say, you know, those words verbatim.
25      Q.    Okay. Did she say anything comparable to "I agree"?
26      A.    To be honest with you, I couldn't recall the total conversation.
27      Q.    You're not sure whether she verbally agreed to it; correct?
28      A.    No. All I can say is I know she didn't say that she wasn't going to do it.

1  . . . .
2  Q. You testified you communicated that accommodation to Bilan; correct?
3  A. Yes.
4  Q. What happened next?
5  A. I believe she then told LaShunda that she wasn't going to remove her head
6     covering when she went to the rental counter.
7  Q. When did she so that in proximity to your conversation with Heather
8     [Phillips]?
9  A. I honestly don't recall.
10 Q. How did you find out she told LaShunda this?
11 A. LaShunda told me.
12 . . . .
13 Q. When LaShunda told you that, what did you do?
14 A. I informed Heather that Bilan didn't want to agree – Bilan didn't want to
15    remove her head covering or she informed LaShunda she didn't want to
16    remove her head covering when she went to the rental counter.
17 Q. What did Heather say?
18 . . . .
19 A. If she didn't remove her head covering when she went to the counter, to start
20    progressive discipline.

[Doc. #50, Ex. B (Bellavia Dep.), p. 29, ll. 5-13, 16-25; p. 30, ll. 1-15; p. 33, ll. 17-25; p. 34, ll. 1-3, 7-12, 18-20].

The evidence does not support Alamo's position that Ms. Nur accepted the proposed accommodation. The most that a reasonable fact finder could infer from Mr. Bellavia's testimony was that Ms. Nur did not immediately respond to Alamo's proposed accommodation. In fact, Bellavia's testimony states that when Ms. Nur did respond to the proposed accommodation, she rejected it by telling LaShunda Brown that she would refuse to remove her head scarf when she was required to go to the customer counter. Alamo has

- 11 -

not raised a material factual issue regarding its burden to show either that it made a good faith effort to accommodate Ms. Nur's religious beliefs or that Ms. Nur accepted the accommodation Alamo offered.[4]

### 2.    **Undue hardship**

An employer need not make an effort to accommodate an employee's religious beliefs if "it can show that any accommodation would impose undue hardship." Heller, 8 F.3d at 1440. "Undue hardship" is created when an accommodation "results in more than a *de minimis* cost to the employer." Id. (citing Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 67 (1986); TWA, Inc. v. Hardison, 432 U.S. 63, 84 (1977)). "A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships; instead, it must be supported by proof of 'actual imposition on co-workers or disruption of the work routine.'" Tooley v. Martin-Marietta Corp., 648 F.2d 1239, 1243 (9th Cir. 1981) (quoting Burns v. Southern Pac. Transp. Co., 589 F.2d 397, 406-07 (9th Cir. 1978)).

Alamo suggests that permitting Ms. Nur to wear a head covering at the rental counter would result in an undue hardship, concluding simply that "any deviation from [Alamo's] carefully cultivated image is a definite burden." [Doc. #55, p. 11]. Without supplying any indication of the cost it would have incurred by permitting Ms. Nur to wear a head covering at the rental counter, Alamo simply assumes the question of cost and argues that "the actual issue to be decided [by the jury] is the magnitude of the burden." [Id.]. The record provides no material factual basis for Alamo's conclusions about the cost of "any deviation" from the uniform policy.

Alamo fails to support its assertion of undue burden with anything other than speculation, which is not a basis to establish a genuine issue of material fact. Victor Bellavia testified that it would not have cost Alamo any money to allow Ms. Nur to wear a head scarf while serving customers. [PSOF Ex. B (Bellavia Dep.), p. 63. ll. 20-25]. Mr. Bellavia did

---

[4]  The evidence established that there were no reasonable exceptions to Alamo's dress policy; in fact, there were no exceptions. See Alamo's Answer To Interrogatory No. 6 discussed at 13-15 herein.

1 state that allowing Ms. Nur to wear a head covering might have affected the efficiency of
2 Alamo's operations by opening the door for other employees to violate the company uniform
3 policy. [Id., p. 64, ll. 4-23]. Bellavia stated that "[t]he only burden I see is other people
4 wanting to break the uniform policy." [Id., p. 67, ll. 1-2]. However, Mr. Bellavia did not
5 believe that allowing Ms. Nur to wear a head covering at the rental counter would affect the
6 impression she would make on customers, or would it negatively impact customer
7 expectations concerning the level of service or quality of the product they would receive, or
8 otherwise create any type of negative expectations with customers. [Id., p. 67, ll. 1-8, 23-25;
9 p. 68, ll. 1-14]. At Bellavia's deposition, EEOC counsel read Alamo's answer to
10 Interrogatory No. 6, which caused the following colloquy:

> Q: If you'll look at the first paragraph, the last sentence of the answer, it says, "Deviations from the uniform policy could tarnish Alamo's image and result in undue hardship on the company." Did I read that correctly?
> A: That's what it says.
> Q: Okay. Now, you're the city manager, obviously; right?
> A: Yes.
> Q: Okay. As city manager, can you tell me how a deviation from the uniform policy to allow Ms. Nur to wear her head covering with customers during Ramadan will tarnish Alamo's image?
> A: No.
> Q: Can you tell me how it would result in any type of undue hardship to the company?
> A: No.

[Id., p. 69, ll.15-25; p. 70, ll. 1-6].

Heather Phillips testified at deposition in relevant part, as follows:

> Q: Would it be fair to state that it would not have cost the company any money if you permitted Ms. Nur to wear a scarf at the counter?
> A: I don't – I don't know if it would. It possibly could.

- 13 -

| | | |
|---|---|---|
| 1 | Q: | Did you believe at the time that Ms. Nur was told that she could not wear a |
| 2 | | scarf at the counter that it would cost the company money? |
| 3 | A: | Potentially. |
| 4 | Q: | Why is that? |
| 5 | A: | Once again, if we allow one person to deviate from the company policy, then |
| 6 | | we would need to allow everybody to deviate from the policy. |
| 7 | | . . . . |
| 8 | Q: | Now, is it your testimony, then, that permitting Ms. Nur an accommodation |
| 9 | | might have cost the company money? |
| 10 | A: | Yes. |
| 11 | Q: | But you're not certain that it would have cost any money? |
| 12 | A: | Correct. |
| 13 | | . . . . |
| 14 | Q: | Do you believe that it would cost any money up front to permit Ms. Nur to |
| 15 | | wear a scarf as an accommodation? |
| 16 | | . . . . |
| 17 | A: | Up front, no. |
| 18 | Q: | So you did not believe there would be any out-of-pocket expenses at that time |
| 19 | | to permit Ms. Nur to wear a scarf at the counter? |
| 20 | A: | Up front, no. |
| 21 | Q: | Okay. But your concern was that it may affect the image with the customers |
| 22 | | and cost the company money? |
| 23 | A: | Correct. |
| 24 | | . . . . |
| 25 | Q: | Other than the customer image, were there any other hardships that you |
| 26 | | believed would occur if you permitted Ms, Nur to wear the scarf at the |
| 27 | | counter? |
| 28 | A: | No. |

- 14 -

1  Q: Would it be fair to state, then, that your concern with respect to Ms. Nur
2     wearing the scarf was that all the other employees would then also want to
3     deviate from the customer policy, the dress policy?
4  . . . .
5  A: That was – yes.
6  Q: And your concern wasn't with respect to Ms, Nur, per se, but it was with
7     respect to opening the flood gate; correct?
8  A: That's correct.

9 [PSOF Ex. C (Phillips Dep.), p. 64, l. 25; p. 65, ll. 1-12; p. 66, l. 25; p. 67, ll. 1-8, 12-14, 18-
10 25; p. 68, ll. 1, 3; p. 69, ll. 8-15, 17-22].

11 The Ninth Circuit has echoed the Sixth Circuit's "skepticism" about "'hypothetical
12 hardships' based on assumptions about accommodations which have never been put into
13 practice." Anderson, 589 F.2d at 402 (quoting McDaniel v. Essex Int'l , Inc., 571 F.2d 338,
14 343 (6th Cir. 1978) and Draper v. U.S. Pipe & Foundry Co., 527 F.2d 515, 520 (6th Cir.
15 1975)). Although Mr. Bellavia and Ms. Phillips concluded that accommodating Ms. Nur's
16 request to wear a head covering at the rental counter might have imposed a cost on Alamo
17 because it would have opened the floodgates to others violating the uniform policy, Alamo
18 has not supplied any basis for concluding that those opinions were anything other than pure
19 speculation. Additionally, Bellavia's and Phillips's conclusion was based on a faulty
20 understanding of Title VII's protections against discrimination based on religious beliefs, that
21 is, that accommodating Ms. Nur's religious beliefs would have required Alamo to forego
22 enforcement of the uniform policy against any employee ("[o]nce again, if we allow one
23 person to deviate from the company policy, then we would need to allow everybody to
24 deviate from the policy."). Under this faulty reasoning, virtually no accommodation could
25 overcome the undue hardship test. Cf. Anderson, 589 F.2d at 402 ("'If relief under Title VII
26 can be denied merely because the majority group of employees, who have not suffered
27 discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to
28 which the Act is directed.'" (quoting Franks v. Bowman, 424 U.S. 747, 775 (1976)).

Because "[u]ndue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts[,]" Anderson, 589 F.2d at 402, and the factual dispute Alamo asserts is grounded only in assumptions and opinion based on a hypothetical scenario, Alamo has not raised a material factual issue concerning undue burden.

## V.   CONCLUSION

Alamo has not presented genuine issues of material fact concerning either EEOC's prima facie case of religious discrimination or Alamo's burden to show that it offered to reasonably accommodate Ms. Nur's religious beliefs or that it could not accommodate those beliefs without undue hardship. Summary judgment has been granted in favor of EEOC on the question of liability.

Accordingly,

IT IS ORDERED that Plaintiff Equal Employment Opportunity Commission's Motion For Partial Summary Judgment (Doc. #49) is GRANTED.

DATED this 26th day of May, 2006.

_____
Roslyn O. Silver
United States District Judge

- 17 -